(Decided Dec. 9th, 1863.)

---

THE MAYOR & CITY COUNCIL OF THE CITY OF BALTIMORE, ET AL., *vs.* CHARLES HOWARD, ET AL.

THE BOARD OF POLICE OF THE CITY OF BALTIMORE, POWERS OF:—As a board of State officers, possessing the power, amongst others, to make disbursements, they could not be disturbed or their power suspended, except by the Legislature; and the disbursement of a portion of the fund for the payment of the salary of one of the board was a legal exercise of their official duty.

A check given to one of the board, and accepted by him in payment of his salary, must be held to be a legal appropriation and disbursement, concluding to that extent the board from any further control over the amount thus appropriated.

Though displaced by a force to which they yielded, and could not resist, their power and rights under their organization were still preserved, and they were amenable for any dereliction of official duty, except in so far as they were executed by uncontrollable events.

They were a board of State officers, strictly within the jurisdiction of the State authorities, and the Courts in determining their rights and obligations, have no other guide than the statute law of the State applicable to this case, and to the parties presenting the appeal.

—: STATUTES, CONSTRUCTION OF.—Acts 1860, ch. 7, 1862, ch. 111, and 1862, ch. 131, relating to the Board of Police of Baltimore City.

APPEAL from the Circuit Court for Baltimore City :

The bill of complaint in this case was filed on the 4th of April 1862, by Samuel Hinds, Nicholas L. Woods, and John Lee Chapman, acting Mayor of the City of Baltimore, constituting the then Board of Police of said city, and the Mayor & C. C. of Balto., *appellants*, against Charles Howard, William H. Gatchell, Charles D. Hinks and John W. Davis, members of the former Board of Police of said city, and the Farmers and Planters Bank of Balto., *appellees.*

The material facts, as set forth in the bill, are as follows: On "the 27th of June 1861, the exercise of the functions of the Police Commissioners of the City of Baltimore was suspended by the Government of the United States, whereupon said Police Commissioners were put off duty and practically discharged; the entire police force which they had established, and which was until then under their control, disbanded, and, by authority of the Government of the United States, a Provost Marshal was appointed for the City of Baltimore, and by him an entirely new and distinct police force was established."

The Act of 1862, ch. 111, passed on the 12th of February 1862, authorized the Mayor and City Council to pay the Provost Marshal of the United States all arrears of salary and wages then due to the officers and men serving under him, and revoked the power of the said Police Commissioners "to use, draw for or disburse," any of the funds provided for police purposes.

The Act of 1862, ch. 131, passed on the 18th of February 1862, created a new Board of Police Commissioners, and altered in various important particulars the previously existing Police Act.

On the 20th of March 1862, the Government of the United States withdrew its police force from the City of Baltimore. At the time when the first named Police Commissioners were put off duty, as alleged, there remained in deposit in the Farmers and Planters Bank, subject to their control, about $8,700 of the police fund. On the 6th of February 1862, William H. Gatchell, treasurer of said commissioners, drew at Fort Warren a check on the fund in said bank in favor of Charles D. Hinks, for the sum of $1000, being for the salary accruing to Hinks, as one of the said commissioners, from the 6th of August 1861, to the 6th of February 1862. This check was presented for payment by Hinks at the counter of the bank on the 8th of February 1862, and payment thereof was refused, in consequence of a notification given to the bank by the Mayor and City Council of Baltimore.

The bill further alleged that $2,800 of the said fund still remained undrawn, and prayed for an injunction to restrain the defendants from drawing or paying out the said balance, and for a decree that it might be paid to the Mayor and City Council of Baltimore. The Circuit Court, (KREBS, J.,) refused to grant the injunction, and filed the following opinion:

"The object of the bill filed in this case, as shewn by the prayer for relief which it contains, is to obtain an injunction to restrain the defendants, Chas. Howard and others, from making any drafts or checks upon, or in any wise changing, diminishing or interfering with the sum of two thousand eight hundred dollars, a balance still remaining undrawn of the sum of eight thousand seven hundred dollars, which was on deposit in the Farmers and Planters Bank of Baltimore, in the name of the Police Commissioners, Charles Howard & others, at the time when they, as the said bill alleges, ceased to discharge the duties impos-

v. 20.

ed upon them, and which they had assumed to perform. This money had been received by the said board upon the requisitions which they were authorized to make upon the register for police purposes, and was so deposited in the said bank. The bill further prays this Court to direct and enjoin the said bank to pay over the said fund to the complainant. The Mayor and City Council of Baltimore, the complainants, for the purpose of shewing in what manner the said Police commissioners were appointed, and whence they derived the power to make requisition for the money of which the said balance is part, refer to the Act of the General Assembly of Maryland, by which the said Charles Howard and three others, together with the Mayor of the City of Baltimore, for the time being, were constituted the 'Board of Police for the City of Baltimore,' and allege that they accepted the appointment conferred upon them by the said Act of Assembly.

"The complainants further allege, that on or about the 27th day of June 1861, the exercise of the functions of the said Police Commissioners was suspended by the Government of the United States, and they were put off duty, and practically discharged, &c., the police force which they had established was disbanded, and an entirely new and distinct police force established by the authority of the Government of the United States.

"The bill then refers to, and exhibits an Act of Assembly, passed on the 19th day of February last, which is entitled, 'An Act to repeal sections 806, 807, 809, 810, 811, 815 and 821, of Article 4th, of the Code of Public Local Laws, relating to Baltimore, and the organization of a Board of Police therefor, and to re-enact the same with amendments thereto.' It alleges that the complainants, Hinds and Woods, are Police Commissioners, under the provisions of the said Act of Assembly, and compose, with the other complainants, the acting Mayor of the City, the Police Board. It then alleges, that the Government of the United States, on the 20th day of March last, with-

drew its police force from the City of Baltimore, and that the complainants, the said Board of Police, have already appointed, enrolled and organized a permanent police force for the said city. Though the bill states other facts, which I shall hereafter consider, yet it insists, 'that by reason of the premises the complainants are now entitled to the possession and disposal of the money remaining on deposit in bank.' Upon the foregoing facts, then, the complainants claim the possession and disposal of this balance, on deposit as above stated; they assume that the funds deposited by the said commissioners were the funds of the public, placed in their hands to enable them to discharge their public duties, and did not belong in any wise the to commissioners in their individual right. With the exception of the Act of Assembly passed in February last, the facts and views above stated, and on which the complainants base the claim to this fund, are substantially the same as those relied upon by the Mayor and City Council in their late application to this Court for an injunction, such as is now prayed for. This Court declined granting an injunction upon that application, and unless there is something in the provisions of the late Act of Assembly which would give to the Mayor and City Council a stronger claim to the interference of this Court, by way of injunction, with the said fund, it would feel constrained, upon that part of the bill now under consideration, and which, as is seen above, is deemed by the complainants sufficient to entitle it to such interference, to decline it now. Amongst the various reason which satisfied the Court then that it ought not to interfere with this fund, in the manner prayed by the Mayor and City Council, were these: That the Police Commissioners were appointed by an Act of the General Assembly of the State, were entirely independent of, and irresponsible to, the city authorities, and altogether exempt from any interference from them; that the special mode of taxation by which the fund was raised, shewed that when it came into the hands of the officers of the corporation, it was in no wise to be

regarded as any part of its funds, and that the corporation had no interest in it, or title or claim to it, before it was drawn by the requisition of the commissioners, and as a necessary consequence none afterwards. Has it acquired any title to it, or control over it, by virtue of this Act of Assembly? It certainly does not, in express terms, give to the corporation any such title or control; because this fund, in controversy, is not mentioned or expressly referred to in any one of the new sections, made part of the original police bill, which is re-enacted by this Act of Assembly; and I have sought in vain for some language or provisions in these sections from which such title or control could, by inference, or any fair implication, be derived.

"The complainants refer to certain changes in the original police law, made by this Act of Assembly, which, it seems, they regard as giving force to their claim; but I cannot discover that they have any such effect. They say: That this police Act has been materially changed in its most important features, and, among others, that the number of the Police Commissioners have been reduced from four to two, and that two of the complainants have been appointed by the Legislature in the place of the former commissioners, who have been removed and superseded in their office, and all authority and duties to them appertaining; that, by the said Act, these complainants constituting the Police Board, are charged with the duty of organizing the police force of the city; that upon the Mayor and City Council of Baltimore is imposed the obligation of providing the means of paying the said police force; that different obligations are imposed on the Police Board; that, among other things, the Police Board are relieved of the custody and disbursement of the police fund, and the register of the city is charged with the duty of such custody and disbursement, and entitled at all times in his official capacity to have the control thereof, and that his official bond is responsible with reference to the same, and that it shall stand and avail as a security. A reference however

to the obligations of this bond will shew, that this Police Board is not relieved from the disbursement of the police fund, and that the register of the city is not charged with such disbursement and with the control thereof. The above are the only provisions in the said new sections, to which the complainants have deemed it proper to refer, and which, in conection with the other matters in their bill above stated, they suppose sustain their claim to have this fund paid to them. But I am of opinion, that there is nothing in these provisions so referred to, or in any other part of these sections, upon which any such claim can be founded. The only moneys or funds to which they in any manner refer, are moneys which may come to the hands of the treasurer, and moneys which may be appropriated and paid over to him as treasurer of the said board, which of course cannot embrace or apply to this money on deposite in this bank, unless the law intends that it shall come into his hands. There is nothing however in these sections that shews any such intention. They do not refer to, or mention in any manner, the Police Commissioners, upon whose requisition this money was paid to them, and who deposited it in bank, nor is there in any part of these sections, any reference to, or mention of this money so deposited, or any provision that these new Police Commissioners shall succeed to all the rights and powers of the former, or that the Mayor and City Council of Baltimore shall be entitled to receive this money. Unless therefore there is something in the other allegations or matters set forth in this bill, upon which such right or claim in the corporation or the said Police Commissioners can be sustained, they must respectively fail in their efforts to maintain it.

"The only other matter to which the complainants refer to shew that they are entitled to the relief they pray, is, an Act passed at the late session of the General Assembly, entitled, 'An Act to repeal so much of Article 4, of the Code of Public Local Laws, as authorizes the persons named in section 807, to disburse the fund therein provided, and to

provide for the payment of the Police force, now in the service of the United States in the City of Baltimore.' This Act provides that the Mayor and City Council of Baltimore be authorized and directed to pay to the Provost Marshal of the United States, in the City of Baltimore, a sum of money, &c., the said payment to be made out of moneys in the hands of the said Mayor and City Council, or other officers of the City of Baltimore, and which, by article 4 of the Code of Public Local Laws, are now subject to the order or appropriation of the Board of Police, created by the said Article.

''It also provides, that the power and authority of the Commissioners of Police named in the aforesaid Article, to appropriate or apply any moneys raised or proposed to be raised under the provisions of the aforesaid Article, and which would, by virtue thereof, be subject to the control of the said commissioners, be revoked and annulled; and it repeals so much of Article 4, as authorized them to use, draw for or disburse, any of the funds provided under said Article, by the Mayor and City Council, to or for any purpose. Now the complainants insist, that since the Acts of the late Legislature above referred to, the said fund now remaining in bank cannot be withdrawn by the said original Board of Police, but must pass as of right into the hands of the complainants, the Mayor and City Council, to be applied under the said recent Act of the Legislature, towards the payment and support of the police.

''Conceding that these Acts of the Legislature have lawfully revoked the powers of the former Police Commissioners, deprived them of all power to apply or dispose of any funds that came into their hands under requisitions that they were authorized to make, and substituted others in their place, and that they have not any right to draw and appropriate this money in bank, yet it by no means follows, that the Mayor and City Council, or the commissioners appointed under the late law are entitled to receive and appropriate it. This Act of Assembly assumes that the mere

revoking of the powers of these commissioners, and declaring that they should no longer draw or appropriate any funds previously under their control, did not necessarily give to the Mayor and City Council the right to receive and appropriate the moneys that had been raised by specific taxation, to enable these commissioners to discharge the duties imposed upon them by law. It deemed something further necessary, and therefore expressly authorized the Mayor and City Council to appropriate these funds. A reference however to the terms of the Act above quoted, will shew, that they are by no means sufficiently comprehensive to embrace this fund in bank. The funds which they are authorized to receive and appropriate, are moneys in the hands of the Mayor and City Council, or other officers of the city, and which were subject to the order or appropriation of the Board of Police, not moneys which the commissioners had taken out of the hands of the Mayor and City Council, and had deposited in their names in bank. It is to be observed, that when this Act, revoking the authority of these commissioners was passed, there was in the hands of the city, or its officers, a large sum of money, which had been raised by taxation, exclusively for police purposes, and there was also this small fund in bank. The Act of Assembly evidently applies to the former alone, and does not at all interfere with the latter. It may be that the Legislature saw some force in an objection to interfering with it, which the complainants in their bill anticipate, as likely to be made. They say: "If those who formerly constituted the said Board of Police, have any claims for services rendered in that capacity, they can only present such claims against the city, as individuals, and not otherwise." The Legislature knowing that these commissioners were appointed by the State, and being entirely independent of the city authorities, and not rendering services to them, could have no claim upon the city for services rendered, may have deemed it but just and equitable, that this fund should remain in the custody in which it was,

until these commissioners might have an opportunity of showing that it should be applied to the satisfaction of charges or expenses legally incurred by them, in their official capacity. They did not voluntarily retire from their duties, but were suddenly removed, and no opportunity was afforded to them to settle their accounts, as required by law. The Legislature, influenced by considerations of common justice, may have been of opinion, that it should not be removed until it appeared clearly from a settlement of accounts with their commissioners, that they had no longer any interest in or claim to it, or to any part of it. For these reasons the law may have been framed in guarded terms, for the express purpose of preventing this fund from being drawn and applied in the manner authorized and directed in reference to the moneys in the hands of the Mayor and City Council or of its officers. Whether or not such was the design of the law, it appears to me that it very successfully accomplishes that object. The complainants allege, that 'the funds so deposited were the funds of the public;' and again, 'that the said fund being public property for public uses,' &c. This view of the nature of the fund is presented in connection with the assertion of their right to have it. It is true that no fault can be found with this designation of it, because it was raised under the authority of the State, to be applied by officers appointed by the State, to purposes in which the State was greatly interested. But the fact that it is public property, or the funds of the public, and within the limits of the City of Baltimore, does not give to these commissioners, or to the corporation, any right whatever to it. The fact that it is public property authorizes the State, or the Legislature, through which the State acts, to dispose of it; but neither the corporation nor any person can acquire any right or title to it, except under an Act of the Legislature. I have endeavored to shew that the Acts which have been cited in this bill, as the basis of a title in the complainant, are altogether insufficient to sustain it. If the design of this

recent Legislation was to give any such right or title, it is imperfect, and fails to accomplish its object. Believing, as I do, that neither the corporation nor the Board of Police, created under the late law, has any right to claim or receive this fund, or to appropriate it, I must decline ordering the injunction prayed for in this bill.''

The cause was argued before Bowie, C, J., and Bartol and Goldsborough, J.

[*Note.*—At the hearing of this cause, learned and elaborate arguments were submitted by the counsel of the appellants and appellees, as to what are the legitimate and constitutional powers of the President of the United States; but as this Court in their opinion filed, have not considered or pronounced upon this question, it has been considered best to present here simply the points made and cases cited in the discussion of that question. —*Rep.*]

*Wm. Price,* for the appellants, argued:

I. In opposition to the following point, being the appellees 1st point, viz:

"That the interference by the Government of the United States, with the Board of Police and police force, established by law in the City of Baltimore, was without authority of law, and did not in any manner affect or impair the rights or invalidate the acts of the said board;'' and in maintaining the converse of the propositions thus presented, cited and relied on the following authorities. Const. of U. S., Art. 1, sec. VIII., sub-secs. 16 and 17. Act of Cong. of Feb. 28th, 1795. *Martin vs. Mott,* 12 *Wheat.,* 19. *Luther vs. Borden,* 7 *How.,* 1.

As to the power of the President of the United States to declare suspended the writ of *habeas corpus,* the case last cited was relied on, in connection with the Const. of the U. S., Art. 1, sec. IX., sub-sec. 2, as maintaining that power.

II. The next question to be considered is the effect of the

action of the Government upon the capacity and rights of the old Police Board. Did the official existence of this board continue after their arrest and imprisonment? That they were arrested and imprisoned by competent authority can not be questioned. Did then their compensation for services continue after they were disabled by competent authority from performing any service at all? Again, the Provost Marshal and his police were appointed by competent authority. Now with the removal of the old board and the appointment of the new, the City of Baltimore had no concern, nor can she be justly held liable to pay two police establishments at the same time.

These are novel and extremely interesting questions, and the Court in resolving them, will have to rely more upon reason than authority, for although there are principles to be found in the books which shed some light upon the subject, yet there are no decisions going the length of this case. The power of the President, derived directly from the Constitution, and by him rightfully exercised in displacing a portion of the constituted authorities of the State, creates the leading and controlling feature of the case, upon which there is no direct authority, for no such case it is believed has ever before arisen.

Upon reason, therefore, how stands the case? It is certain that the City of Baltimore had no choice but to regard the Provost Marshal and his police as legally in office, and the old board and police as legally out of office. It was her duty to submit to the paramount authority of the President, and she did so willingly and cheerfully; she not only submitted to the authority of the police set over her by the Government, but she paid that police for their services.

Now what is the claim set up by the defendants? It is that they shall be paid for services which they never rendered, and which they were disabled from rendering by a rightful authority, as binding upon the city as upon themselves. That is, that the city shall pay both

police establishments. Upon what principle? If it were even conceded that the Provost Marshal and his force were the police of Baltimore *de facto*, and the old board and their force, the police *de jure*, yet it is well settled that there cannot be an officer *de facto* and one *de jure* in possession of the same office at the same time. *Boardman vs. Holliday*, 10 *Paige C. R.*, 223. It is also settled that the acts of an officer *de facto* are as effectual as far as the rights of third persons and the public are concerned, as if he were an officer *de jure*. The business of life could not go on if it were not so. *Burke vs. Elliot*, 4 *Iredell (Law,)* 359. *Fowler vs. Behr*, 9 *Mass.*, 331.

The case therefore resolves itself into the proposition, was this money legally appropriated? How appropriated? Was it by those having the rightful control of the funds at the time? This rightful control must be established, before we are permitted to talk about appropriation. Certainly it was not the money of the commissioners, they had no property in it. The act, which is considered an appropriation, was done officially, and in the performance of a public trust, and at a time when that trust had passed out of their hands and was exercised by others. But how can a person appropriate that in which he has no property and over which he has at the time no power of disposition. To say that the commissioners had appropriated this portion of the fund, without first showing that the fund was under their control, is begging the question. We are thrown back therefore upon the position already examined and disposed of, that the commissioners while separated from their trust, no matter by what authority other than the wrongful act of the city authorities, were *functus officio*. When the Provost Marshal took possession of the office he did so with power and capacity totally inconsistent with the exercise of any authority at all by the ousted board. What order could they give which could be obeyed? What regulation could they make, which any one would be willing or able to respect? It is idle to talk of an appropriation under such circumstances.

III. The only question left for consideration is, whose money is it? In the judgment of the judge below, if the elaborate opinion filed by him in dismissing the bill is understood, this money was unfortunately like a waif dropt in the pursuit. The old commissioners could not draw it, the Mayor and City Council had no authority to use it, and it did not belong to the bank. The averment of the bill, that it was the money of the public, and that the public was represented by the Mayor and City Council, was treated as wholly inadmissible. But after a great deal of quotation and explanation the conclusion is finally reached, that "the fact that it is public property, authorizes the State, or the Legislature through which the State acts, to dispose of it, but neither the corporation nor any person can acquire any right or title to it, except under an Act of the Legislature." In the meantime the fund is left in bank, and all restraints upon the right of the old commissioners to check it out, and upon the bank to honor the checks, are removed, and by the time another Act of the Legislature can be obtained, the fund will have disappeared and there will be nothing to dispute about.

The judge remarks that it is nowhere provided, "that the new Police Commissioners shall succeed to all the rights and powers of the former, nor that the Mayor and City Council shall be entitled to recover this money." The meaning is, that the old board had the power to draw and dispose of it, while the new board have no such such power. But how can such a proposition be maintained? Both boards are public agents, both appointed by the Legislature, with duties described in detail by the Act of Assembly. The new board are the successors in office of the old board, appointed by the same authority, to execute the same duties, except only in so far as those duties have been altered or modified by the recent legislation on the subject. To this legislation the judge refers, to ascertain whether in any part of it the power is given to the new board to use or dispose of this money. And not finding any such

authority, he concludes that no such power exists, and dismisses the bill accordingly. It was certainly right to refer to the supplementary legislation, not for the purpose of ascertaining whether the new board were clothed with the power in question, but for the very different purpose of seeing whether this power had been taken away. Because all the rights, duties and powers of the old board belong to their successors in office, unless they have by competent authority been changed or taken away.

Now the mere forms of legislations as prescribed by the Constitution, throw light upon this subject. I pause for a moment to examine those forms. The Constitution, Art. 3, section 17, provides, that when the codification of the laws shall be completed and adopted, "it shall be the duty of the Legislature in amending any Article or section thereof, to enact the the same as the said Article or section would read when amended." Accordingly in the amendments alluded to, the directions of the Constitution were faithfully pursued. The new legislation was but an amendment of the old in certain particulars, which left the system of police remaining except so far as altered. The title to the Act of 1862, ch. 131, shows precisely what was intended by it. It is "An Act to repeal section 806, &c., of Article fourth, of the Code of Public Local Laws, relating to Baltimore City, and the organization of a Board of Police therefor, and to re-enact the same with amendments thereto." And the Act then proceeds to strike out each section intended to be amended and to re-enact it in its modified form. The meaning of all this we are not permitted to mistake. It is to be the same law, the same system of police, the same board, except in so far as changed or modified.

The sections repealed and re-enacted were 806, 807, 809, 810, 811, 815 and 821. And in neither of those sections, in their original or in their amended form, is there any power either given or withheld to use or appropriate money. The nearest that either section approaches to such

a power is in that part of the 806th section, which provides that one of the old board shall be appointed treasurer, and shall give a bond in a penalty of $50,000, "conditioned for the faithful application and payment over, pursuant to the order and direction of said board, of all moneys which may come to his hands as such treasurer." And the amended section declares, "that the register of the City of Baltimore for the time being, shall be and act as treasurer of the Board of Police, and his official bond given as register of the City of Baltimore, shall stand and avail as security for the faithful discharge of the duties imposed upon him as treasurer, and for the faithful application and payment over, pursuant to the order and direction of the said board, of all moneys which may come to his hands as such treasurer."

That the old board had the power to apply and use this money is admitted, and for that very reason the new board must have it, unless the power has been taken away by the supplementary legislation, which has been examined and found not to be the case. It is almost too plain for argument, therefore, that the power to use and apply this money as the power exists in regard to all other moneys raised by the city for police purposes, is in the present board.

But this is not all. It was the 818th section of the fourth Article of the Code of Public Local Laws, which gave to the old board the power to estimate, to draw their requisition upon the Mayor and City Council for such sums as they may require for executing their duties under that Article. And that section has been left untouched by any of the amendments alluded to. It is the law for the new board precisely as it was for the old. The absence of a provision declaring "that the new Police Commissioners shall succeed to all the rights and powers of the former," is not at all wonderful. Indeed it would have been a little strange if such a superserviceable clause had been introduced into the amendatory matter of the last session. I

have looked over the whole Act with all the amendments, and cannot find a place where such a clause could be introduced. It is certain that the power of the board in regard to the use and application of the public funds, is just as ample without such a provision as it would have been with it.

When a new board comes in all the funds then on hand and unexpended pass at once into its hands. The use and appropriation of such funds is only one of the duties to which the new board has succeeded, as it has to all the other duties. It sounds strange to hear it said that the old board had the power but the new board has it not, when the power of each is precisely the same.

The Act of 1862, ch. 111, shows very plainly what the Legislature thought on this question. That Act provides in substance that the Provost Marshal of the United States and his police force are entitled to pay from the city, and it declares that the authority of the Commissioners of Police named in the old law (who were then in Fort Warren) to appropriate or apply any moneys raised or proposed to be raised under the provisions of Article four, of the Code, *and which would by virtue thereof be subject to the control of the said commissioners,* was thereby revoked and annulled. This Act was levelled at those individuals. It was intended to stop their power "to use, draw for or disburse, any of the funds provided under said Article." The Act covers this very case, it contemplates the very contingency which has given rise to this case, and it settles it. It was passed on the 12th of February 1862, and the check of Mr. Gatchell was drawn on the 6th of the same month. The bill was introduced before the check was drawn, though passed afterwards.

*George W. Brown* and *F. W. Brune*, for the appellees, argued:

1st. That the interference by the Government of the United States with the Board of Police and police force es-

tablished by law in the City of Baltimore, was without authority of law, and did not in any manner affect or impair the rights or invalidate the acts of said board.

2d. That the Act of 1860, ch. 7, which is re-enacted in the Code vol. II., Art. 4, sec. 806, &c., made said board entirely independent of any control or interference by the Mayor and City Council of Baltimore, (see especially sections 818 and 822 of Code,) and that the money drawn by said board, on its requisitions from the proper disbursing officer of said corporation, was to be held, appropriated and disbursed by said Board of Police in their discretion, for the purpose of discharging the duties by law imposed on them. *Mayor, &c., vs. Board of Police,* 15 *Md. Rep.,* 402, 403, 445, 462, 464, 465.

3d. That the Act of 1862, ch. 111, passed February 12th, 1862, which directs the payment therein provided for, "to be made out of any moneys in the hands of the *said Mayor and City Council, or other officer of the City of Baltimore,* and which by the provisions of Article 4, of the Code of Public Local Laws, are now subject to the order or appropriation of the Board of Police created by said Article," does not apply to the money in the Farmers and Planters Bank, because said money is the balance of a fund which was drawn by requisitions from time to time upon the proper disbursing officer of the City of Baltimore, and deposited in the name of said board, in said bank, to be drawn by them as occasion might require, for the purpose of enabling them to perform the public duties entrusted to them, and is therefore not in the hands of said Mayor and City Council, or other officer of the City of Baltimore. Neither said board nor said bank are officers of the City of Baltimore. But the Act was designed to apply to the money collected by the city for the use of said board, for which, by the 818th section of the 4th Article of the Code, said board were "authorized to make requisitions from time to time upon the Mayor, Register, Comptroller of the City of Baltimore, or other proper disbursing officer or officers of the corpora-

tion," for the purpose of "executing their duties under this Article," and which had not been drawn by said board from such disbursing officer of the city.

4th. That the Act of 1862, ch. 131, does not authorize the Board of Police thereby created to draw out or interfere, in any manner, with the money deposited as aforesaid, by the original Board of Police, in the Farmers and Planters Bank of Baltimore.

5th. That the check for $1,000, a copy of which is in the agreement filed in this case, drawn February 6th, 1862, by Wm. H. Gatchell, Treasurer, to the order of Charles D. Hinks, for the salary due him, and countersigned by Charles Howard, President, and presented to said bank by said Hinks for payment on the 8th of February 1862, operated as an appropriation for the benefit of said Hinks of the amount of $1,000 of the fund in said bank, on which it was drawn. 3 *Kent's Com. 8th Ed., top p.* 134, *marg.* 105, note. *Story on Prom Notes, p.* 620, *sec.* 491, *note.* *Fogiarties vs. State Bank,* 12 *Richardson, S. C. Law.,* 518, 8 *Am. Law Reg.,* 393. *Brown vs. Lusk,* 4 *Yerger,* 210. *Weston vs. Barker,* 12 *Johns.,* 276. *Morrison vs. Bailey,* 5 *Ohio State,* 17. *Hoyt vs. Seeley,* 18 *Conn.,* 360. *In re Brown,* 2d *Story R.,* 502, 516. *Boehm vs. Sterling,* 7 *T. R.,* 423, 429, 430. 2 *Story's Equity, secs.* 1044, 1047. *Smith vs. Everett,* 4 *Brown's Ch.,* 64. *Lett vs. Morris,* 4 *Simons,* 607. 1 *Hill N. Y. Rep.,* 583.

6th. That said Act of 1862, ch. 111, was not passed until the 12th of February 1862, after said appropriation was made, and could not have a retroactive effect so as to impair the rights of said Hinks, even if it had been its purpose so to do, which it manifestly is not, for the second section of said Act repeals so much of Article 4 of the Code, as authorizes said board to use, draw for or disburse, any of the funds provided under said Article, but does not attempt to invalidate any previous Act of said board. *Smith on Statutory Construction,* 679. *Baugher vs. Nelson,* 9 *Gill,* 302.

45      v. 20.

*Butler vs. Boarman*, 1 *H. & McH.*, 371. *Chancellor's Case*, 1 *Bl.*, 595. *Magruder vs. Carroll*, 4 *Md. Rep.*, 348.

7th. No facts, whatever, are alleged in support of the allegation in the bill, that there is reason to believe that checks will be drawn or presented by or on behalf of said board, the defendants in this cause, inequitably and illegally to draw out the money still remaining in the Farmers and Planters Bank of Baltimore, or a considerable portion thereof, for purposes not authorized by law, and the allegation of the bill cannot be accepted as furnishing any proof of so grave a charge. Even if such facts did exist, it would not justify the interference of this Court on behalf of the complainants, who have no interest in the fund which they seek to enjoin. *Union Bank vs. Poultney*, 8 *G. & J.*, 332. *Nusbaum vs. Stein*, 12 *Md. Rep.*, 315.

8th. There is no allegation of irreparable damage, or of such loss and injury as are necessary to justify the issuing of an injunction. The sum in bank is only $2,800, and it is not pretended that the Board of Police are insolvent, and would not be able to make good this small sum if it should be misapplied by them. The bond of the treasurer would also be liable, and affords abundant security, for it is "conditioned for the faithful discharge of his duties as treasurer of the Board of Police, and for the faithful application and payment over, pursuant to the order and direction of said board, of all moneys which may come into his hands as such treasurer." If the treasurer should make payments after the powers of the board were lawfully suspended or had ceased, his bond would be liable, but it is not to be presumed that he would do so, or that the board would violate their duty by an attempt to pay out public money after their powers had ceased.

9th. Proper parties have not been made; the State of Maryland should have been made complainant, and an injunction should have been prayed against Wm. H. Gatchell, treasurer of the board who had the custody of the funds.

10th. The appointment by the Legislature of the defend-

ant Hinks, as commissioner, with a fixed salary, and his acceptance of the office, constituted a contract on the part of the State to pay the salary while he continued in office, and the State could pass no law impairing the obligation of the contract.  Constitution of the U. S., Art. I, sec. 10.

In reply to the appellants' argument under the first point discussed, the following cases were cited: *Mitchell vs. Harmony*, 13 *How.*, 115. *Mostyn vs. Fabrigas*, 1 *Cowp.*, 180. *Carpenter vs. United States*, decided in 1863, opinion by Taney, C. J.  Acts of Cong. of July, 13th, 1861, and May 20th, 1862.  Also, opinion of C. J. Taney in *Merryman's Case.*  The cases in 12 *Wheat.*, 19, and 7 *How.*, 1, were also commented on and explained.

GOLDSBOROUGH, J., delivered the opinion of this Court:

After a careful investigation of the proceedings in this cause, we concur in the view taken by the judge of the Circuit Court, and for the reasons assigned in the opinion delivered by him, the order of the seventh day of February 1862, refusing to grant the injunction prayed for in the complainants' bill, will be affirmed.

The counsel for the respective parties having agreed upon a statement of facts in reference to the claim of Charles D. Hinks, arising from the check mentioned in the statement; and having requested this Court to express their opinion thereon for the purpose of avoiding further litigation; we have accordingly considered the same, and are of opinion that Mr. Hinks is entitled to demand payment of the check referred to, from the Farmers and Planters Bank of Baltimore, it being conceded that the Police Board had deposited in that bank sufficient funds to meet it, and that there was no objection to the form of the check, or that it was not drawn in conformity with the regulations of the Police Board in making their disbursements.

By the third section of the 7th ch. of the Act of 1860, a Board of Police, to be called "The Board of Police of the City of Baltimore," was constituted, to consist of four per-

sons; and their salaries were prescribed by the same section. By the fourth section, the appellees were appointed the first commissioners. By the 15th section, authority was given to the Police Board to estimate what sums of money would be necessary for each fiscal year to enable them to discharge the duties imposed on them; and the Mayor and City Council, upon being certified of the estimated amount, were required to raise the same by taxation, to be denominated the Police Tax. This fund, when received by the Police Board, was to be held, appropriated and disbursed by them in their discretion, for the purpose of discharging the duties by law imposed on them.

As a board of State officers, possessing the power amongst other powers to make disbursements, they could not be disturbed or their power suspended, except by the Legislature.

Whatever acts were therefore done, within the sphere of their duty, it cannot be questioned that the disbursement of a portion of the fund for the payment of the salary of one of the board, as in this case, was a legal exercise of their official duty.

It is conceded that the check alluded to, was given to Mr. Hinks on the sixth day of February 1862, and it appearssthat the appellees were not removed or their powers revoked until the 12th day of February 1862, when the Act was passed and took effect, creating the new Police Board.

The check given to Mr. Hinks, and accepted by him in payment of his salary, must be held as a legal appropriation and disbursement, concluding, to that extent, the board from any further control over the amount thus appropriated.

But it is contended by the appellants, that in the interval between the time of the organization of the appellees, and their removal under the provisions of the Act of 1862, ch. 131, and at the time when this check was given, they were displaced, and their functions suspended by the intervention of a police force in the service of the United States,

in the City of Baltimore; and being thus displaced, they were not entitled to receive their salaries, though provided by law.

We do not concur in this view of the effect of their displacement and suspension of their functions. On the contrary, though displaced by a force to which they yielded and could not resist, their powers and rights under their organization were still preserved, and they were amenable for any dereliction of official duty, except in so far as they were excused by uncontrollable events.

They were a board of State officers, strictly within the jurisdiction of the State authorities, and we, in determining their rights and obligations, have no other guide than the statute law of the State applicable to this case, and to the parties presenting this appeal for our review.

*Order affirmed with costs to appellees.*

(Decided Dec. 11th, 1863.)